FILED

APR 1 8 2008

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

POSTED ON WEBSITE

NOT FOR PUBLICATION

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
FRESNO DIVISION

| | |
|---|---|
| In re | Case No. 06-10085-B-7 |
| Lynn D. Sneed, | |
|         Debtor. | |
| Robert Hawkins, as Chapter 7 Trustee for the Estate of Lynn D. Sneed, | Adv. Proc. No. 07-1094 |
|         Plaintiff, | |
|         v. | |
| Angela Garcia, Mark A. Garcia, Jewel McMillen and Robert E. McMillen, | |
|         Defendants. | |

**MEMORANDUM DECISION RE COMPLAINT
TO AVOID FRAUDULENT TRANSFER**

This memorandum decision is not approved for publication and may not be cited except when relevant under the doctrine of law of the case or the rules of res judicata and claim preclusion.

Shane Reich, Esq., appeared on behalf of the plaintiff, Robert Hawkins, chapter 7 trustee (the "Trustee") for the estate of Lynn D. Sneed (the "Debtor").

Iain A. MacDonald, Esq., of MacDonald & Associates, appeared on behalf of defendants Angela Garcia, Mark A. Garcia, Jewel McMillen and Robert E. McMillen (the "Defendants").

/ / /



1    In this adversary proceeding, the Trustee contends that the Debtor made a

2 fraudulent transfer of her residence (the "Property"). He alleges that the Property was

3 sold for less than "reasonably equivalent value," thus making the transfer avoidable

4 pursuant to 11 U.S.C. § 548(a)(1)(B).[1] Alternatively, the Trustee alleges that the transfer

5 is avoidable under § 548(a)(1)(A) as having been made with actual intent to hinder, delay,

6 or defraud creditors. Looking to parallel state law, the Trustee contends that the transfer

7 was actually and/or constructively fraudulent under Cal. Civil Code § 3439 et seq. The

8 Property has already been transferred to a third party so the Trustee seeks a money

9 judgment from the Defendants in lieu of recovering the Property itself, pursuant to

10 § 550(a). For reasons set forth below, judgment will be entered for the Defendants.

11    This memorandum decision contains the court's findings of fact and conclusions

12 of law as required by Federal Rule of Civil Procedure 52(a), made applicable to this

13 adversary proceeding by Federal Rule of Bankruptcy Procedure 7052. The bankruptcy

14 court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and 11 U.S.C. § 548

15 and General Orders 182 and 330 of the U.S. District Court for the Eastern District of

16 California. This is a core proceeding as defined in 28 U.S.C. § 157(b)(2)(H).

17 **Findings of Fact.**

18    The Debtor and defendant Mark A. Garcia ("Garcia") both testified at trial as

19 adverse witnesses for the Trustee. Their testimony frequently conflicted. Where

20 Debtor's testimony contradicted Garcia's testimony, the court finds Garcia's testimony to

21 be the more credible.[2] This is the Debtor's third consecutive bankruptcy case in the span

22

---

23    [1]Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy

24 Code, 11 U.S.C. §§ 101-1330, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-
9036, as enacted and promulgated *subsequent* to October 17, 2005, the effective date of The

25 Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. 109-8, Apr. 20,
2005, 119 Stat. 23.

26

27    [2]The Debtor did not have a good recollection of the facts and answered many of the
questions poorly. Debtor's trial testimony, her bankruptcy schedules, and her testimony at the

28 § 341 meeting of creditors were contradictory, as well as inconsistent, with the schedules in her

2

of two years.  The prior bankruptcy case most pertinent to this dispute is the first case, which was filed under chapter 13 on April 21, 2004, in the Modesto Division of this court (case no. 04-9156; the "Modesto Case").  The court takes judicial notice of the documents filed in the Modesto Case and some of the facts below are taken from that record.

The Debtor purchased the Property, her primary residence, in Copperopolis, California in 2002.  At the commencement of the Modesto Case, the Property was subject to a first trust deed securing a loan from Fairbanks Capital Corporation in the approximate amount of $155,000 (the "Fairbanks Mortgage").  The Property was also subject to a  second trust deed in favor of Stockton Mortgage, Inc. ("Stockton") securing a loan with a balance owing of $61,551.78 (the "Stockton Mortgage").  The Debtor obtained the loan from Stockton to finance the construction of an addition to the Property. It is unclear whether that addition was properly completed.  Based on Schedule D filed in the Modesto Case, real property taxes were owed to the Calaveras County Tax Collector in the amount of $2,014.[3]  Altogether, the taxes and mortgage liens totaled approximately $218,565.[4]  In the Modesto Case, the Debtor claimed an exemption of her "equity" in the Property in the amount of $113,343.  There were no objections to that exemption.

Garcia owns and operates Garcia Family Bail Bonds, a bail bond business in Modesto, California.  Sometime prior to the Modesto bankruptcy, Garcia entered into a contract with the Debtor to furnish a bail bond for the benefit of one of the Debtor's friends, a certain Eric Smith ("Smith"), in the amount of $90,000 (the "Smith Bail Bond").  In conjunction with that transaction, the Debtor agreed to indemnify Garcia from any liability on the Smith Bail Bond.  To secure that indemnity obligation, she executed a

---

two prior bankruptcy proceedings.

[3]Conflicting evidence suggested that the property taxes may have actually exceeded $4,000.  For purposes of this analysis, the court will use the lower figure.

[4]The Property was conveyed by the Debtor before the commencement of this bankruptcy and the liens against the Property were not scheduled in this petition.  The information above was taken from Debtor's schedules and Stockton's proof of claim filed in the Modesto Case.

3

1    third trust deed against the Property in the amount of $90,000 (the "Garcia Trust Deed").

2    The fee for the Smith Bail Bond was $9,000. The record does not establish how much of

3    the fee was actually paid. The Debtor testified that she paid part of the fee with credit

4    cards. In addition, the Debtor gave Garcia two checks toward payment of the fee in the

5    amounts of $1,250 dated April 1, 2002 (defendants' exhibit L),[5] and $4,500 dated

6    February 24, 2004 (defendants' exhibit M). However, both of those checks were

7    dishonored by the bank and returned to Garcia for insufficient funds (the "NSF checks").

8         At some point Smith failed to appear for a hearing as required by the terms of his

9    bail. After an investigation, and with the Debtor's assistance, Garcia successfully located

10   Smith, he was apprehended and returned to custody. Garcia incurred costs in connection

11   with that effort in the approximate amount of $1,250.[6]

12        In February 2004, the Debtor listed the Property for sale with a real estate agent for

13   $330,000. The Property was only about two years old, but it needed a significant amount

14   of clean-up and repair work. The Debtor did not receive any offers during the course of

15   the listing and only one potential buyer came to inspect the Property. The listing ran for

16   six months and was scheduled to expire on August 24, 2005.

17        The Debtor never made any payments on the Stockton Mortgage. By the time the

18   Debtor commenced the Modesto Case, both the Stockton Mortgage and the Fairbanks

19   Mortgage were in default, and the Stockton Mortgage was proceeding to foreclosure.

20   Once in bankruptcy, the Debtor failed to make any payments to the chapter 13 trustee and

21   she was unable to confirm a chapter 13 plan. On July 12, 2004, the bankruptcy court

22

23        [5]The first check #24 bears the handwritten date April 1, 2002, however, the date stamp on

24   the back of the check shows that it was deposited on March 31, 2004. There was no evidence as
     to when the Smith Bail Bond was actually issued or when the first check was actually tendered.

25   Neither the Smith Bail Bond, nor the Garcia Trust Deed were offered into evidence at trial. The
     Debtor's obligation to Garcia, and the Garcia Trust Deed were not listed on the schedules in the

26   Modesto Case.

27        [6]Garcia testified on cross-examination that he was owed about $7,000, including the cost

28   to apprehend Smith and the two NSF Checks which totaled $5,750.

4

1    ruled on the trustee's motion that the Modesto Case would be dismissed if the Debtor

2    failed to confirm a chapter 13 plan by August 3, 2004, the date set for a hearing on the

3    Debtor's motion to confirm her first modified plan. At that hearing, the court denied

4    confirmation on the objection of Stockton. On August 12, 2004, the Modesto Case was

5    dismissed.

6         It is not clear how the discussions developed between the Debtor, Garcia and

7    Defendant Robert E. McMillen ("McMillen"). The Debtor testified that she had

8    previously sold an "old car" to McMillen and that she knew Garcia through the bail bond

9    business.[7] Sometime during the twilight of the Modesto Case, Garcia learned about the

10   pending foreclosure and offered to purchase the Property to protect the Garcia Trust

11   Deed, his collateral for the Smith Bail Bond.[8] The exact terms of Garcia's initial offer

12   were not disclosed, but the Debtor rejected an offer which included $15,000 in cash in an

13   effort to negotiate a higher price. Garcia was not listed on the schedules, nor was he

14   given notice of Modesto Case, and the Debtor did not tell Garcia and McMillen that she

15   was in bankruptcy at the time. Neither did she seek approval from the bankruptcy court

16   to sell the Property.

17        On August 1, 2004, just before the failed confirmation hearing in the Modesto

18   Case, the Debtor entered into a written Agreement to Purchase Real Estate wherein she

19   agreed to sell the Property to Garcia and McMillen for $220,000 (plaintiff's exhibit 6, the

20   "Purchase Agreement"). As consideration for the Property, Garcia and McMillen agreed

21   to pay the Debtor $20,000 in cash (the Debtor requested cash), assume all existing debt

22   secured by the Property, and immediately reinstate the Stockton Mortgage default. On

23

24        [7]The relationship between Garcia and McMillen was not discussed at trial. Presumably,

25   McMillen was a business partner or associate with Garcia. Defendants Jewel McMillen and
     Angela A. Garcia were not added to the Property's title until February 25, 2005,

26   contemporaneous with the Defendants' sale of the Property to the third party.

27        [8]Garcia testified that he was contacted by the Debtor, that she was "frantic," and she told

28   him that in 48 hours she was going to lose the Property that secured the Garcia Trust Deed.

5

August 2, the Debtor executed a Grant Deed in Lieu of Foreclosure to the Property in favor of Garcia and McMillen (plaintiff's exhibit 7). Garcia and McMillen made two cash payments to the Debtor totaling $18,900. The Debtor herself had no independent recollection of the amount of cash she received from the transaction, however, she testified that she felt it was "very fair" at the time. A handwritten memo at the bottom of the Purchase Agreement confirms that Garcia and McMillen paid $6,000 upon execution of the Purchase Agreement with the balance due after the Debtor vacated the Property. A second handwritten memo dated August 21, 2004, confirms that Garcia and McMillen paid an additional $12,900 in cash (defendant's exhibit N). The balance of $1,100 was not accounted for, presumably it was either paid or offset against the costs incurred by Garcia to locate and apprehend Smith. Garcia also forgave the two NSF Checks in the amount of $5,750, which the Debtor had given in payment of the Smith Bail Bond fee. Garcia testified that he had 48 hours to reinstate the Stockton Mortgage default or the Property would go to foreclosure sale. Believing that a foreclosure was imminent, on August 3, 2004, Garcia paid $20,854 to bring the Stockton Mortgage current and stop the foreclosure (plaintiff's exhibit 11).[9]

After the Debtor vacated the Property, Garcia paid approximately $7,000 to third parties to clean and repair the Property. Garcia also testified that he and his son spent from 80 to 100 hours working to clean up and make the Property saleable. Garcia testified that he "struggled" to make the regular mortgage payments until the Property could be resold. On or about February 25, 2005, the Defendants sold the Property to a

---

[9] It is not clear whether the foreclosure sale was actually set to take place in 48 hours, or whether that was the deadline to reinstate the mortgage default under California law. (Cal.Civ.Code § 2924c(e).) Further, it is not clear what information Garcia relied upon, other than the Debtor's "frantic" telephone call (see footnote supra, 8), to verify the deadline. Again, the Debtor had not told him about the Modesto bankruptcy so he would not have been aware that there was an automatic stay in place. Stockton did not move for relief from the automatic stay. Stockton had objected to confirmation of the Debtor's chapter 13 plan and presumably Stockton was ready to foreclose shortly after the Modesto Case was dismissed.

6

third party for the sum of $314,000 (the "Resale Price"). The Seller's Final Settlement Statement from that sale reports that the first and second mortgages were paid in full, and the County property taxes were paid (plaintiff's exhibit 9). After payment of the real estate commission, certain construction liens and closing costs, the Defendants received cash from the sale in the amount of $100,283.44.[10] There was no evidence to show if or when the Garcia Trust Deed was reconveyed, or whether the Smith Bail Bond had been discharged by the time the escrow closed in February 2005.

The Trustee's expert witness, Paula Priester, a qualified real estate appraiser (the "Appraiser"), testified that the Property had a fair market value of approximately $275,500 at the time it was transferred to Garcia and McMillen (plaintiff's exhibit 10). This was the only evidence introduced as to the Property's fair market value.[11] The Appraiser's valuation reflected a $3,000 discount for "clutter" and the anticipated cost of cleaning the Property. There was no evidence at trial regarding the estimated cost of sale, had the Debtor been able to sell the Property for its appraised value. For purposes of this analysis, the court estimates that cost of sale would have been at least 7% or $19,285; a 6% real estate broker's commission of $16,530, plus escrow fees and related expenses of at least 1% or $2,755. Had the Debtor been able to sell her Property for the appraised value, that sale would have generated approximately $256,215, before payment of the taxes and other secured obligations.

///

---

[10]The Seller's Final Settlement Statement showed, *inter alia*, a credit to replace the propane stove ($600), the payment of a bill to inspect and pump the septic tank ($437.50), payment for work done to repair the roof ($1,260), glass repairs ($562.51), and the purchase of a home warranty policy ($335).

[11]There was much disputed testimony regarding the condition of the Property, and the amount which Garcia subsequently expended for repairs, etc. However, the Appraiser testified that she considered the Property's condition in her analysis. There was no other evidence to show how the subsequent repairs affected the Property's value at the time of the transfer.

7

**Issue.**

The issues for resolution here are (1) did the Debtor convey her Property to Garcia and McMillen with actual intent to hinder, delay, or defraud any creditors, and (2) did the Debtor receive reasonably equivalent value from Garcia and McMillen in exchange for her interest in the Property.

**Analysis and Conclusions of Law.**

**Actual Fraud.**

Under § 541(a)(1)(A), the Trustee can avoid the Debtor's sale of the Property if the transfer was made with actual intent to hinder, delay, or defraud her creditors. Whether or not the Debtor acted with such intent is a question of fact. *In re Sholdan*, 217 F.3d 1006, 1010 (8th Cir.2000). The Trustee has the burden of proof on that issue.

Upon review and consideration of the evidence, the court is not persuaded that the Debtor sold the Property with actual intent to hinder, delay, or defraud anybody. By August 1, 2004, when she signed the Purchase Agreement, the Debtor's life was in chaos. She was in serious financial difficulty, her chapter 13 bankruptcy was about to collapse, and her home was facing imminent foreclosure. Her life was further complicated by the fact that a significant "friend" was facing criminal prosecution, and in need of bail bond services for which the Debtor had become financially obligated. Garcia and McMillen promised to accept the Property and be responsible for all of its attendant financial obligations. They also agreed to release the Debtor from any personal liability with regard to the Smith Bail Bond and the unpaid fee for the Bail Bond. In addition, the Debtor would receive a significant amount of cash from the transaction. Regardless of what consideration she received from Garcia and McMillen, the Debtor's decision to transfer the Property bore none of the indicia of fraud.

Garcia's primary motivation for purchasing the Property was to protect his collateral for the Smith Bail Bond - an interest which would soon be extinguished in

1   Stockton's foreclosure.[12]  Garcia and McMillen invested a substantial amount of money to

2   protect the Property.  They paid the Debtor almost $20,000 in cash, they immediately paid

3   almost $21,000 in cash to Stockton to reinstate the mortgage default, and they undertook

4   the responsibility for servicing two mortgages while they labored to rehabilitate the

5   Property, investing several thousand dollars of time and money in that effort.  The

6   evidence does not suggest that any creditors were injured by the Debtor's sale of the

7   Property.  Indeed, the Debtor had already exempted all of her equity, if any, in the

8   Modesto Case, so none of the Property's value would have flowed to unsecured creditors

9   through the bankruptcy process.  In the end, all of the creditors with liens against the

10  Property eventually got paid in full after Garcia cleaned up and repaired the Property and

11  resold it in February 2005.

12  **Constructive Fraud.**

13          Under § 548(a)(1)(B), the Trustee may set aside the Property transfer as

14  constructively fraudulent if the Debtor (1) received less than reasonably equivalent value

15  in exchange for the Property, and (2) was insolvent on the date of the transfer or became

16  insolvent as a result of the transfer.  The pertinent factor here is the first one: Was the

17  Property sold for "reasonably equivalent value"?[13]  The relevant time for determining

18  what was "reasonably equivalent value" is the time of transfer.  See *BFP v. Resolution*

19  *Trust Corp.*, 511 U.S. 531, 546 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994).  Again, under

20  § 548, the Trustee bears the burden to prove each element of his claim for relief; the

21  _____

22      [12]Garcia testified that he paid $700 to have the roof and walls inspected and did some
    research to make sure the deal would be "profitable."  The court construes this testimony to mean
23  that Garcia wanted to make sure he was not "dumping good money after bad money."  There was
    no evidence to suggest, based on market values, that Garcia thought he could resell the Property
24  for a substantial profit.

25      [13]There was no evidence introduced to show that the Debtor was insolvent at the time she
26  sold the Property to Garcia and McMillen.  The schedules she filed in the Modesto Case reported
    her assets to exceed her liabilities by approximately $87,000, however, she valued the Property in
27  those schedules at $330,000, $54,500 more than it was later appraised for.  Based on the court's
    ruling with regard to the two issues above, the question of "insolvency" is not material.
28

1     Trustee must show that the Debtor did not receive "reasonably equivalent value." *5*

2     *Collier on Bankruptcy*, (15th Ed. Revised, 2007), ¶ 548.10, at 548-80.5; *Jumer's Castle*

3     *Lodge, Inc. v. Jumer*, 338 B.R. 344, 354 (C.D. Ill. 2006).

4         The term "reasonably equivalent value" is not defined in the Bankruptcy Code.

5     That function has been left to the courts. *McCanna v. Burke*, 197 B.R. 333, 338-39

6     (D.N.M. 1996). It is clear that "reasonably equivalent value" is not just another term for

7     "fair market value." As the U.S. Supreme Court stated in *BFP v. Resolution Trust Corp.*,

8     511 U.S. at 531, "fair market value is not necessarily the benchmark against which

9     determination of reasonably equivalent value is to be measured. It may be presumed that

10    Congress acted intentionally when it used the term 'fair market value' elsewhere in the

11    Bankruptcy Code but not in § 548, particularly when the omission entails replacing

12    standard legal terminology with a neologism."

13        There is no hard and fast rule in the Ninth Circuit as to what constitutes

14    "reasonably equivalent value." The concept of "reasonable equivalence" is not wholly

15    synonymous with "market value" even though market value is an extremely important

16    factor to be considered in the court's analysis. *In re Morris Communications NC, Inc.*,

17    914 F.2d 458, 466 (4th Cir.1990). The transferee's "good faith" is also a relevant factor.

18    *In re Smith*, 24 B.R. 19, 23 (Bankr. W.D.N.C. 1982).

19        Whether the transfer is for "reasonably equivalent value" in every case is largely a

20    question of fact, to which considerable latitude must be given to the trier of fact. *In re*

21    *Ozark Restaurant Equip. Co.*, 850 F.2d 342, 344 (8th Cir. 1988). In order to determine

22    whether a fair economic exchange has occurred, the court must analyze all the

23    circumstances surrounding the transfer in question. *5 Collier on Bankruptcy*, (15th Ed.

24    Revised, 2007), ¶ 548.05[1][b] at 548-36.

25        Considering all of the circumstances surrounding the Debtor's agreement to sell

26    the Property to Garcia and McMillen, the court is persuaded that the Debtor received

27    "reasonably equivalent value" for her interest in the Property, or what was left of it at the

28    time. Debtor was on the verge of losing the Property; she had tried unsuccessfully for six

1  months to sell the Property through a real estate agent, but the Property was in need of
2  repair and for various reasons was apparently unmarketable. The immediacy of a
3  nonjudicial foreclosure proceeding is one of the "price-affecting characteristics" of the
4  Property which cannot be ignored in the "reasonably equivalent value" calculation. See
5  *BPF v. Resolution Trust Corporation*, 511 U.S. at 539

6          The Trustee cites this court's earlier decision in *Salven v. Munday (In re Kemmer)*,
7  265 B.R. 224 (Bankr. E.D. Cal. 2001) for the proposition that the price paid at a "fire
8  sale" of real property is not necessarily "reasonably equivalent value" for purposes of
9  § 548. The Trustee's reliance on *Kemmer* is misplaced because there are significant
10  differences between this case and the facts in *Kemmer*. In *Kemmer*, the transferred
11  property was the debtors' vacation home. The debtors had a substantial amount of equity
12  in the property and no way to protect it from the creditors of their failing business. There
13  was no imminent foreclosure and the debtors were not really interested in realizing the
14  maximum value for their property. The debtors only wanted to recover enough cash out
15  of the property to fund an exemption in their primary residence before their creditors
16  could attach judgment liens against the vacation home. They listed the property, a
17  mountain cabin high above the snow line in the Sierra Nevada Mountains, for sale in the
18  middle of the winter. At the time, the property was virtually inaccessible, except by
19  snowshoe or snowmobile. The debtors made no effort to market the property during the
20  customary selling season for similar properties. Instead, they entered into a "fire sale"
21  agreement to sell the property, to their real estate agent, one week after it was listed for
22  sale. The real estate agent knew that the property could be cleaned up and resold during
23  the summer months for a substantial profit. The selling price was calculated based on the
24  bare minimum amount needed to pay the recorded liens and to fund the Kemmer's
25  homestead exemption. Under those circumstances, I ruled that the price paid by the real
26  estate agent was not "reasonably equivalent" for purposes of § 548. I noted in *Kemmer*
27  that "reasonably equivalent value" is a question of fact to be determined in every case.
28  *Id.* at 232. I did not rule in *Kemmer* that a sale of real property on the eve of foreclosure

1 | is *per se* avoidable in every case.

2 |     The *Kemmer* decision is distinguished from this case by the fact that the Kemmers
3 | never made any effort, nor did they have the time or the desire, to market their property
4 | for a fair market price. Seizing on an opportunity for a quick profit, the real estate agent
5 | quickly purchased the property for the intentionally lowest price he could. Here, the
6 | Debtor had the Property listed for sale for six months, receiving no offers. It was
7 | apparently in poor condition; only one potential buyer even looked at the Property. There
8 | were two mortgages against the Property, both were in default, and Stockton's foreclosure
9 | was imminent. Garcia and McMillen literally "rescued" the Property to protect the
10 | collateral for the Smith Bail Bond. The Trustee has not shown, or given the court any
11 | evidence upon which it could infer, that the Debtor could have done anything else to save
12 | the Property from Stockton's foreclosure, that any real "value" was lost, or that the
13 | Debtor's creditors were hurt in any way by the transfer to Garcia and McMillen.

14 |     The court's decision here is further supported by an analysis of the "value," which
15 | Garcia and McMillen actually gave for the Property. There are two ways to make that
16 | calculation, with and without the Garcia Trust Deed. As discussed above, a hypothetical
17 | sale of the Property for its appraised value would have generated about $256,215 after
18 | payment of a real estate commission and the escrow costs. When Garcia and McMillen
19 | agreed to purchase the Property, they took it subject to the County property taxes and the
20 | two outstanding mortgages, totaling approximately $218,565. They gave the Debtor cash
21 | in the amount of at least $18,900, and forgave another $7,000 liability for the Smith Bail
22 | Bond fee and costs, bringing the "consideration" package up to more than $244,465.
23 | Without including the Smith Bail Bond and the Garcia Trust Deed, it appears that the
24 | Debtor received a "bundle" of consideration - cash and debt relief - equal to about 95% of
25 | what she would have received through escrow in a hypothetical sale. The consideration
26 | which the Debtor received from Garcia and McMillen was certain and capable of
27 | calculation. The amount which she might have received through a "fair market" sale was
28 | hypothetical and problematic. The Trustee cites no authority for the proposition that a

1   transfer which actually returns 95% of a hypothetical "fair market" is not "reasonably
2   equivalent."

3       With the Smith Bail Bond and the Garcia Trust Deed added to the equation, the
4   numbers overwhelmingly favor the Defendants. When Garcia and McMillen accepted the
5   Property, the Debtor's personal obligation to indemnify the Smith Bail Bond in the
6   amount of $90,000 was essentially forgiven; Garcia's sole recourse in the event of a claim
7   against the Smith Bail Bond was his investment in the Property. Considering the Garcia
8   Trust Deed, it appears that the Debtor received a package of cash and debt relief worth
9   approximately $334,465, which exceeded the gross price the Debtor tried to sell the
10  Property for; it exceeded the appraised value by almost $60,000, and it exceeded the
11  subsequent Resale Price by more than $20,000. Clearly, the Debtor received "reasonably
12  equivalent value" under that scenario.

13      At this point, it is necessary to address two questions which arise with regard to the
14  Smith Bail Bond and its role in the "reasonably equivalent value" calculation.[14] The first
15  question relates to the validity of the Smith Bail Bond. Garcia and the Debtor entered
16  into an apparently lawful agreement whereby Garcia agreed to provide a $90,000 bail
17  bond for Smith. Arguably, the Smith Bail Bond transaction itself may have been subject
18  to avoidance since the Debtor was not the beneficiary of the Smith Bail Bond and
19  apparently did not receive any consideration for its issuance, or for the pledging of her
20  Property as its collateral. However, the Trustee did not seek to set aside the Smith Bail
21  Bond transaction, or the Garcia Trust Deed, so the court has no choice but to treat them as

22

23
_____

24      [14]At the beginning and again at the conclusion of the trial, the court specifically asked the
        parties to address and brief the question, what consideration should be given to the Smith Bail
25      Bond and the Garcia Trust Deed. The court was not certain at that time that the Garcia Trust
        Deed should be counted as an encumbrance against the Property. There was virtually no
26      evidence presented on that issue other than Garcia's testimony that the Smith Bail Bond had been
        discharged. Neither party addressed the Bail Bond issue in their post-trial briefs. The Trustee
27      summarily dismisses the Smith Bail Bond from any consideration without any explanation or
28      analysis.

                                        13

1  legally enforceable obligations at the time of the transfer.

2      The next question arises from the fact that no claim was made against the Smith

3  Bail Bond. Garcia testified that Smith successfully "defended" the criminal charges

4  against him and that Garcia's obligation under the Smith Bail Bond was eventually

5  discharged. Since Garcia was exonerated from his liability under the Bail Bond, is it

6  proper to give the Defendants full credit for the face amount of the Bond ($90,000) in the

7  "reasonably equivalent value" calculation? The short answer is "yes."

8      There was no evidence to show that the Smith Bail Bond had been discharged at

9  the time Garcia and McMillen acquired the Property. Indeed, the court can infer from

10 Garcia's testimony regarding the Debtor's "frantic" telephone call (see footnote 8, supra),

11 and his subsequent investment to stop the Stockton foreclosure, that the Smith Bail Bond

12 was still a binding obligation to the state court. For that matter, there was no evidence to

13 show that the Smith Bail Bond had been discharged by the time the Defendants resold the

14 Property in February 2005. Smith had already failed to appear for at least one court

15 hearing, causing Garcia to spend money to locate him. Had Smith taken flight and failed

16 to appear again, Garcia could have been obligated to pay the court up to $90,000 to fund

17 Smith's recapture. Once Garcia and McMillen agreed to purchase the Property, and

18 released the Debtor from any personal liability relating to the Smith Bail Bond, the

19 Property became the only practical source for indemnity in the event a claim was made

20 against the Bail Bond. The Trustee produced no evidence to show otherwise. The

21 "reasonableness" of the transaction must be determined based on the facts and

22 circumstances as they existed at the time of the transaction. It would be particularly

23 unfair to consider, by hindsight, subsequent events, such as dismissal of the criminal

24 charges against Smith and discharge of the Smith Bail Bond, unless those events were

25 reasonably anticipated or known to Garcia at the time of the transaction.

26      The Trustee argues, again with reference to the *Kemmer* decision, that the

27 Defendants quickly resold the Property and made a $100,000 profit as evidenced by the

28 escrow company's closing statement (plaintiff's exhibit 9). The Trustee infers here,

14

without supporting evidence, that the fair market value of the Property was substantially more than the Appraiser, his own witness, testified it was worth at the time it was sold by the Debtor, and that the Defendants unfairly profited from the transaction.[15] This argument completely mischaracterizes the facts and the law. "Reasonably equivalent value" is determined at the time of the transfer, not six months later after a significant change in circumstances. Further, as discussed above, the Defendants actually resold the Property for about $20,000 less than the bundle of consideration they gave the Debtor six months earlier. The $100,000 they received from the escrow company did not cover the Defendant's investment in the Property, plus the indemnity obligation on the Smith Bail Bond. Again, there was no evidence to show that the Smith Bail Bond had been discharged by the time the Property was resold. Even if it had been, that would not change the calculation of "reasonably equivalent value" given at the time Garcia and McMillen first acquired the Property.

///
///
///
///
///
///
///
///
///

---

[15]The Trustee argues in his post-trial brief that the "value" of the Property, for purposes of calculating a money judgment, should be based on the Resale Price the Property was sold for in February 2005. The Trustee spends much time then arguing over what liens and expenditures should be deducted from the Resale Price. He asks for a money judgment in the amount of $109,630.15, based on the difference between the Resale Price and the encumbrances on the Property. Interestingly, the Trustee asks for a judgment that exceeds the amount which the Defendants received from the February 2005 escrow.

15

**Conclusion.**

Based on the foregoing, the court is not persuaded that the Debtor transferred the Property with actual intent to hinder, delay, or defraud her creditors. Further, the Trustee has not sustained his burden of proof that the Debtor did not receive a "reasonably equivalent value" for the Property under all of the circumstances. Accordingly, judgment will be entered for the Defendants. The adversary proceeding will be dismissed.

Dated: April _____ 18 _____, 2008

W. Richard Lee
United States Bankruptcy Judge